UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

TAMMY R. ELLIS,                    )
                                   )
            Plaintiff              )
                                   )
      v.                           )  Case No. 2:09 cv 145
                                   )
MICHAEL J. ASTRUE, Commissioner    )
of Social Security,                )
                                   )
            Defendant              )

OPINION AND ORDER

This matter is before the court on a petition for judicial review of the decision of the Commissioner of Social Security filed by the plaintiff, Tammy R. Ellis, on February 8, 2010. For the reasons set forth below, the decision of the Commissioner is REVERSED and REMANDED.

Background

The plaintiff, Tammy R. Ellis, filed a Title II application for a period of Disability and Disability Insurance Benefits and a Title XVI application for Supplemental Security Income on September 20, 2005. (Tr. 22) Both allege a disability onset date of April 1, 2004. (Tr. 22) Ellis' claim initially was denied on March 20, 2006, (Tr. 57-60) and again denied upon reconsideration on June 19, 2006. (Tr. 53-55) Ellis requested a hearing before an Administrative Law Judge ("ALJ") on August 2, 2006. (Tr. 50-51) A hearing was held before ALJ Denise McDuffie Martin on October 30, 2007, at which Ellis, medical expert ("ME") Walter J. Miller, M.D., and vocational expert ("VE") Grace Gian-

forte testified.  (Tr. 404-450)  On October 30, 2008, the ALJ issued her decision denying benefits.  (Tr. 22-34)  The ALJ found that Ellis had not been under a disability as defined in the Social Security Act from April 1, 2004 through October 30, 2008.  (Tr. 33-34)  Ellis requested review of the decision on November 21, 2008.  (Tr. 13-17)  The Appeals Council denied the request on March 18, 2009.  (Tr. 4-6)  Ellis filed a complaint in this court on May 21, 2009.

The ALJ found that Ellis' earnings records showed that she had acquired sufficient quarters of coverage to remain insured through September 30, 2004.  (Tr. 22, 61-63)  The issue in this claim is whether Ellis established that she was disabled on or before September 30, 2004, and is entitled to a period of disability and disability insurance benefits.  (Tr. 22)

Ellis was born on March 13, 1972, making her 38 years old at present.  (Tr. 282)  Ellis has been obese since at least 2000.  (Tr. 282)  Since 2003, her weight has fluctuated between 199 pounds and 254 pounds.  (Tr. 114, 233)  Ellis has a family history of hypertension and heart disease.  (Tr. 119)  She suffered a heart attack on April 19, 2002, after which she stopped smoking.[1]  (Tr. 283-84)  Ellis had a hysterectomy in March 2004.  (Tr. 151)  Following her heart attack and hysterectomy, Ellis experienced back pain, chest pains, panic and anxiety

---

[1] Ellis reported to various doctors and during her disability hearing that she had stopped smoking within a few months of her 2002 heart attack.  (Tr. 284, 337, 427)  The records for two emergency room visits show that in September and October 2005, Ellis reported smoking one pack of cigarettes per day.  (Tr. 119, 114)

attacks, concentric hypertrophy, hypertension, and high cholesterol. (Tr. 280-81)

Throughout 2003, Ellis' treatment was provided primarily by Dr. David Chube. (Tr. 272-282) Ellis saw Dr. Chube in February 2003 following her heart attack and was prescribed Lopressor, Plavix, Imdur, Lipitor, Accupril, Xanax, and Vicodin. (Tr. 281) Ellis saw Dr. Chube again in March and April 2003 to follow up on her medications, high blood pressure, and cholesterol. (Tr. 278-281) Ellis saw Dr. Chube in October 2003, after having been off her heart and pain medications for five months. (Tr. 277) Dr. Chube placed her back on her heart and pain medications. (Tr. 277)

In 2003, Ellis was treated in hospitals on three separate occasions. (Tr. 279, 300, 301) On March 26, 2003, Ellis fainted and went to the emergency room where she was treated for dehydration and a urinary tract infection. (Tr. 279, 301) On October 14, 2003, Dr. John Gustaitis took radiologic views of Ellis' right shoulder and spine. (Tr. 300) He found that Ellis had a normal right shoulder and lumbar spine. (Tr. 300) On November 3, 2003, Dr. Frederick Hartker performed a Lumbar MRI to evaluate Ellis' lower back pain radiating to the back of her legs and causing numbness in her legs. (Tr. 299-300) The MRI showed small protruding discs at L4-L5 and at L5-S1, which did not produce significant stenosis and showed otherwise unremarkable results. (Tr. 299)

In January, February, and March 2004, Ellis experienced severe abdominal pain, stomach cramps, and vaginal bleeding. (Tr. 151-155, 162)  On March 15, 2004, Dr. Deborah McCullough performed a pelvic ultrasound and diagnosed bilateral ovarian cysts.  (Tr. 298)  Ellis had a hysterectomy at the end of March 2004.  (Tr. 151)

Following her hysterectomy, Ellis visited Dr. Chube each month with complaints of back pain, leg pain, and right knee pain.  (Tr. 143-151)  Ellis also stated that sometimes when she walked her "knee goes out."  (Tr. 148)  Four radiology views taken of Ellis' right knee showed no fracture or dislocation. (Tr. 164)  On October 12, 2004, Ellis complained of chest pain while coughing.  (Tr. 144)  Ellis continued to see Dr. Chube at least monthly for the remainder of 2004, and he prescribed Vicodin and Xanax through October 2004.  (Tr. 144-155, 276-281) On November 11, 2004, Dr. Chube referred Ellis to a pain management specialist.  (Tr. 143)  Dr. Chube did not refill Ellis' pain medication prescriptions, but he did refill her prescriptions for Lopressor, Plavix, Imdur, Lipitor, and Accupril.  (Tr. 143)

Ellis began treatment with the pain management specialist, Dr. Julian Ungar-Sargon, on November 22, 2004, to treat lower back pain, right leg pain, and a focal right lumbar root lesion at L5-S1.  (Tr. 234-239)  Dr. Ungar-Sargon prescribed a course of sacroiliac injections which he administered on December 1, 9, 15, and 22, 2004.  (Tr. 229-233)  Ellis saw Dr. Chube on December 9,

4

2004, and she stated that the sacroiliac injections had not been successful in reducing her pain and that her blood pressure had been as high as 210/107, though it was recorded as 150/100 during that exam. (Tr. 142)

Dr. Ungar-Sargon continued to administer the injections to Ellis at two week intervals through 2005. (Tr. 179-228) He sent update letters regarding Ellis' treatment to Dr. Chube on January 27, February 24, and March 21, 2005. (Tr. 285-287) Dr. Ungar-Sargon wrote that Ellis continued to experience symptoms such as spasm, loss of range of motion, and tenderness and that he renewed her prescriptions for Vicodin and Xanax. (Tr. 285-87) He also stated that her sensory and cerebellar tests were normal, her reflexes were active and equal, and she exhibited strength of 5/5 on the MRC scale. (Tr. 285-287) The January 27, 2005 update letter stated that Ellis' condition had been improving with the injections but that "she has now gone back to work and slipped on the ice a week ago unfortunately." (Tr. 287)

Through 2005, Ellis continued to be treated by both Dr. Chube and Dr. Ungar-Sargon. (Tr. 136-141, 179-228) Ellis saw Dr. Chube in January and February 2005 for ear and neck pain, constant coughing, and elevated blood pressure. (Tr. 140-41) Ellis' blood pressure was 140/100 at both appointments. (Tr. 140-41) Dr. Chube increased Ellis' prescription for Accupril. (Tr. 140) Ellis continued to see Dr. Chube monthly through June 2005 for treatment of high blood pressure and pain management. (Tr. 136-139)

Ellis also continued to receive bi-weekly injections from Dr. Ungar-Sargon. (Tr. 179-228) During her February 24, 2005 appointment with Dr. Ungar-Sargon, Ellis complained of worsening back and left hip pain. She also stated that if she slept in a bed, she could not get up. (Tr. 225) A lumbar spine MRI was performed by Do Paik, M.D., on March 8, 2005. (Tr. 109-111) The medical history shows that Ellis reported lower back and left leg pain that had been ongoing for approximately one year. (Tr. 109) The MRI found mild central protruded discs at L4-L5 and L5-S1 with very broad base and without significant change from a previous MRI. The rest of the study was unremarkable. (Tr. 109-111)

On June 9, 2005, Ellis reported to Dr. Ungar-Sargon that she had gone to the emergency room the previous night for treatment of paralysis and severe pain and was given Morphine and Flexeril. (Tr. 214) Ellis' blood pressure during her appointment with Dr. Ungar-Sargon was recorded as 151/95. (Tr. 214) Dr. Ungar-Sargon sent a letter to Dr. Chube stating the Ellis' blood pressure never had been that high before and that he would stop treating Ellis with pain medications until she had seen Dr. Chube.[2] (Tr. 305) On June 14, 2005, Dr. Chube examined Ellis and found her blood pressure to be 130/80. (Tr. 136) Dr. Chube also found that Ellis had not been prescribed Vicodin and Xanax by Dr. Ungar-Sargon. Because her blood pressure was controlled, Dr.

---

[2]Dr. Ungar-Sargon had recorded Ellis' blood pressure as 170/100 on December 15, 2004; 163/92 on January 29, 2005; and 159/91 on February 24, 2005. (Tr. 230, 227, 225)

Chube prescribed the medications and instructed Ellis to resume pain management. (Tr. 136) Dr. Ungar-Sargon resumed her injections on June 27, 2005. (Tr. 195-212)

Ellis was treated in the emergency room for chest and back pain radiating to her left shoulder on September 3, 2005. (Tr. 118-131) During this visit, Ellis reported that she was employed as a desk clerk at the Pioneer Motel in Gary, Indiana.[3] (Tr. 118) Ellis was treated by Dr. Gregory Gordon who found that she was tearful and reported pain of 10/10. (Tr. 119) Dr. Gordon also found that Ellis' color was good, her lungs were clear, her respiration was not labored, and she had no peripheral edema. (Tr. 119)

Diagnostic tests were performed during the visit. (Tr. 122-128) Ellis had no fracture or dislocation of the lumbosacral spine. (Tr. 122) Ellis' cardiac function was normal. (Tr. 125) An x-ray showed a borderline enlarged heart, though this was explained as possibly being due to the technique, and confirmed clear lungs and no pleural effusion or pneumothorax. (Tr. 128)

An ECG performed at 10:11 pm showed marked sinus arrhythmia but was an otherwise normal ECG. (Tr. 131) An EKG performed at 12:48 am showed sinus arrhythmia and a non-specific wave abnormality. (Tr. 129) An EKG at 2:00 am showed normal sinus rhythm but non-specific wave abnormalities that were more marked than on

---

[3] Ellis also reported that she was employed as a desk clerk at the Pioneer Motel in Gary, Indiana during two subsequent hospitals visits: an October 4, 2005 emergency room visit and a November 8, 2005 admission prior to a catheterization procedure. (Tr. 113, 168)

the earlier EKG. (Tr. 130) Ellis' troponin results were below the diagnostic range for acute myocardial infarction. (Tr. 125-26)

Ellis continued bi-weekly sacroiliac injections with Dr. Ungar-Sargon. (Tr. 179-194) Dr. Ungar-Sargon reported that Ellis experienced back spasm and pain but had a good response to therapy, no leg edema, no abdominal masses, no neurological or genitourinary symptoms, and no head, ear, eyes, nose, or throat symptoms. (Tr. 191-194) During her September 28, 2005 appointment, Ellis reported pain of 10/10. (Tr. 189-90) Dr. Ungar-Sargon continued to treat Ellis with injections through December 1, 2005.[4] (Tr. 179)

Dr. Chube referred Ellis to cardiologist Dr. Vijay Dave. (Tr. 337) On September 29, 2005, Ellis began treatment with Dr. Dave and reported to him that she had had chest pains for two weeks, swelling of her feet for one month, shortness of breath for two months, arthritis for two years, high blood pressure for three years (which was controlled with medication), and continuing back pain. (Tr. 343-345) An EKG administered in the office showed left ventricular hypertrophy and non-specific ST-T wave changes. (Tr. 340) Dr. Dave found that Ellis had hypertension, hypertensive cardiovascular disease with acute myocardial infarction, and congestive heart failure. (Tr. 337-340) He added

---

[4] Notes in Dr. Chube's reports indicate that Dr. Ungar-Sargon stopped treatment in December 2005 and was waiting for Medicaid approval before resuming treatment. (Tr. 249-50) It appears that Dr. Ungar-Sargon did not resume treatment. (Tr. 409)

Lasix and a Potassium supplement to her regime of Hydrocodone, Accu-pril, Xanax, Lipitor, Metoprolol, and Plavix. (Tr. 339-40) Dr. Dave continued to treat Ellis through the date of her hearing in October 2007. (Tr. 404, 409)

On October 4, 2005, Ellis was admitted to the emergency room for fever, lower right quadrant pain that radiated to her back, nausea, decreased appetite, abdominal pain of unknown origin, and a urinary tract infection. (Tr. 113-117) Ellis reported pain of 10/10. (Tr. 114) The treating physician found that Ellis' weight was 199 pounds, her color was good, her temperature was 101.8 degrees, and her abdomen was non-tender to the touch. (Tr. 116) Ellis' pain remained high. (Tr. 117) During the visit she stated that she thought the cause of the pain might be muscular due to her having moved heavy furniture two days before. (Tr. 116) Her liver, spleen, pancreas, and kidneys were normal. (Tr. 117) Ellis was treated for the urinary tract infection because she was symptomatic, and she was discharged with instructions to follow up with Dr. Chube if her symptoms became worse or new symptoms arose. (Tr. 115)

On October 31, 2005, Ellis was given an ECG and a stress test ordered by Dr. Dave. The ECG showed normal left ventricular systolic function, a prominent left atrium, and mild mitral and moderate aortic regurgitation. (Tr. 303) The stress test showed poor exercise capacity, no chest pain or arrhythmia, equivocal submaximal EKG stress test, and no exercise induced myocardial

ischemia. (Tr. 304) Ellis' estimated ejection fraction was 60%. (Tr. 304)

Dr. Dave scheduled a cardiac catheterization of Ellis for November 9, 2005. (Tr. 350-359) Prior to the procedure, Ellis was given a chest x-ray which showed mild cardiomegaly, but was otherwise unremarkable. (Tr. 341) Her blood work and cardiac function were within normal range. (Tr. 171-173) An ECG administered on November 8, 2005, returned a normal result. (Tr. 174) The catheterization procedure showed a normal coronary angiography and normal findings. (Tr. 175-76)

Ellis filed for disability benefits in September 2005. (Tr. 22) The Social Security Administration and Disability Determination Bureau requested and received several reports regarding Ellis' condition. These reports include a disability determination report from Dr. Teofilo Bautista regarding Ellis' abilities and condition, both a Psychiatric Review by J. Pressner, Ph.D., a Determination of Disability by F. Kladder, Ph.D., and a Capacity Assessment by Dr. M. Ruiz. (Tr. 35, 241-243, 320-333, 372-379)

On December 12, 2005, Ellis saw Dr. Bautista for a physical examination to determine disability. (Tr. 240) Dr. Bautista found that Ellis had a history of congestive heart failure, hypertension, hypertensive heart disease, angina pectoris, and low back pain due to possible degenerative joint disease of the lumbosacral spine with mild central protruded disc at L4-L5 and L5-S1. (Tr. 242) He also noted that Ellis' muscle tone and

10

strength were 5/5, she had good reflexes and sensation in her extremities, and she had a good grip strength. (Tr. 242) Ellis was unable to do a range of motion of the hips and back exercise. (Tr. 241-42)

Dr. Bautista noted no pedal edema and no pain or tenderness in Ellis' knees. (Tr. 242) Ellis had a normal gait with no limping, and was able to do tandem, heel, and toe walking. (Tr. 242) He found her lungs were clear, her heart had a regular rate and rhythm, and her neck had a good range of motion. (Tr. 241) He also found that Ellis only walked or drove short distances, only lifted ten pounds, climbed only a few steps at a time, did only light household chores, and could not sweep or mop. (Tr. 241) During the exam, Dr. Bautista noted no shortness of breath, that Ellis moaned when getting out of a chair, and that she was able to get on and off an exam table without difficulty. (Tr. 241)

On March 6, 2006, Ellis was given a Treadmill Exercise Tolerance Test requested by the Disability Determination Bureau. (Tr. 306) She was found to have an abnormal baseline EKG due to infarction and non-specific ST-T changes, reduced exercise capacity, no arrhythmia, and no significant EKG changes. (Tr. 309) The doctor stopped the test when Ellis had difficulty breathing. (Tr. 306) He recommended considering a Thallium stress test. (Tr. 309)

On March 16, 2006, Ellis was given a psychiatric evaluation by J. Pressner, Ph.D. and F. Kladder, Ph.D. (Tr. 320-333) Dr.

Pressner found Ellis suffered from non-severe impairment, anxiety related disorders, and a coexisting non-mental impairment that required referral to another medical specialty. He noted Activities of Daily Living ("ADL") indicated that Ellis was capable of some cooking, cleaning, and helping with homework. (Tr. 332) He found Ellis could drive to doctor appointments, read, watch television, and get along with others. (Tr. 332) He concluded that Ellis was not disabled. (Tr. 35)

Dr. Dave ordered an MRI of Ellis' lumbosacral spine on March 26, 2006, which showed mild disc degeneration of L4-L5 and L5-S1, mild to moderate disc protrusion, and mild scoliosis of the lumbar spine convex to the right side. (Tr. 382, 387) On April 27, 2006, Ellis complained to Dr. Dave of chest pains and palpitations on exertion. (Tr. 334) A 24-hour Holter Monitor Study given to Ellis to find the cause of her palpitations showed that she had normal sinus rhythm. (Tr. 366-371) An ECG performed on May 16, 2006, showed mild to moderate abnormalities present. (Tr. 349) A follow up Nuclear Treadmill Stress Test on the same day showed that Ellis had fair exercise capacity, no chest pain or arrhythmia, no exercise induced myocardial ischemia, a negative EKG stress test, and ejection fraction of 50%. (Tr. 346-47)

In June 2006, Dr. Ruiz completed a physical Residual Functional Capacity assessment ("RFC") of Ellis. (Tr. 372-379) He noted that Ellis could lift or carry between ten and 20 pounds, that she could stand, sit, or walk with normal breaks for six hours in an eight hour work day, and that her ability to push or

12

pull was not limited by her condition.  (Tr. 372-379)  Dr. Ruiz also found that Ellis could exercise for six minutes on a treadmill, that she was not limping, that she could tandem, heel, and toe walk, and that her strength was 5/5.  (Tr. 372-379)

Ellis saw Dr. Dave in March, April, and June 2007.  (Tr. 385-392)  She complained of severe back pain, palpitations, panic attacks, and an inability to sleep through the night.  (Tr. 389-392)  Dr. Dave noted severe pain reaction on March 13, 2007, though he pronounced her fit for March 14 surgery to remove a right ovary with cysts.  (Tr. 389-392)  A March 26, 2007 MRI showed mild disc degeneration and protrusion of L4-L5 and L5-S1 and mild scoliosis of the lumbar spine.  (Tr. 382-83, 387-88)  Ellis saw Dr. Dave on April 10, 2007, complaining of continued pain and back ache.  (Tr. 386)  Dr. Dave decided against prescribing pain medications for Ellis and referred her to pain management.  (Tr. 386)

On June 19, 2007, Ellis saw Dr. Dave for a continuous headache which had lasted for two months.  He found that she also had anxiety, hypertension, and arthritis.  (Tr. 385)  Dr. Dave noted that Ellis' lungs were clear, that she could move all four limbs, and that the cause of her headache was unknown.  (Tr. 385)  He returned Ellis to the care of Dr. Yoon, a pain management specialist.  (Tr. 385, 414)  Ellis had been treated by Dr. Yoon for approximately four months by the date of the hearing.  (Tr. 414)

On October 17, 2007, a follow-up radiology study was done of two views of Ellis' chest, which found mild cardiomegaly but no

infiltrate or congestion and clear costophrenic angles. (Tr.
394) On October 18, 2007, Dr. Dave performed another catheteri-
zation of Ellis' heart. (Tr. 395) He found concentric hypertro-
phy of the left ventricle with normal ejection fraction and
slightly increased end diastolic pressure, along with normal
coronary arteries, and that the angioplasty artery appeared open
with normal blood flow. (Tr. 395)

On October 23, 2007, Dr. Dave completed a Cardiac Residual
Functional Capacity Questionnaire. (Tr. 398-403) Dr. Dave re-
lated that he had treated Ellis every six to eight weeks since
2004.[5] (Tr. 398) On the questionnaire, Dr. Dave diagnosed Ellis
as affected by obesity, angina, hypertension brought on by the
obesity, and concentric hypertrophy of Ellis' left ventricle.
(Tr. 398) Dr. Dave identified a number of symptoms from which
Ellis suffered, including chest pain, angina equivalent pain,
shortness of breath, fatigue, weakness, palpitations, dizziness,
sweatiness, and pain in the middle of her chest radiating down to
her left arm. (Tr. 399) He wrote that Ellis' angina, stress,
and depression due to obesity and pain rendered her incapable of
even low stress jobs and that she was not malingering. (Tr. 399)

Dr. Dave also reported that Ellis was capable of sitting,
standing, or walking for only very limited periods of time. (Tr.
401) He asserted that she was unable to perform any job and that

---

[5] Elsewhere the record indicates Dr. Dave began treating Ellis towards the end
of 2005. (Tr. 337)

her medications left her prone to drowsiness and fatigue.[6]  (Tr. 400-01)  Dr. Dave explained that Ellis' legs should be elevated if she were to sit for long periods, but he did not answer a question about how high her legs should be elevated.[7]  (Tr. 401)  Dr. Dave reported that Ellis occasionally could lift and carry less than ten pounds but that she could lift and carry ten pounds only rarely.  (Tr. 402)  He noted that Ellis should avoid all hazardous or negative environmental conditions.  (Tr. 402)  Dr. Dave found Ellis never could twist, stoop, crouch, or climb ladders or stairs.  (Tr. 402)  He estimated Ellis would miss more than four days of work per month.  (Tr. 403)

The disability determination hearing took place on October 30, 2007.  (Tr. 406)  Both the ALJ and Ellis' attorney questioned Ellis, the ME, and the VE.  (Tr. 405-450)  Ellis had been under the care of primary care, cardiac, and pain management physicians for some years.  (Tr. 407-409)  Ellis testified that she had a heart attack in 2002, after which she quit smoking.[8]  She also stated that she did not drink alcohol or take illegal drugs.  (Tr. 419, 427)  She said that her severe, continuous back pain began following her 2004 hysterectomy.  (Tr. 423)  She also stated that she knew her weight was a factor in her health

---

[6] Dr. Dave did not answer a question asking for the name and daily dosages of all of Ellis' prescribed medications.  (Tr. 400)

[7] Participants in the October 30, 2007 hearing tried to clarify this question. (Tr. 444-45, 447-449)

[8] See note 1 regarding Ellis' smoking history.

situation, she had been advised by doctors to lose weight, and she had been trying to do so. (Tr. 411)

Ellis testified that she experienced pain of 10/10, which was reduced to 8/10 or 7/10 after she took her medications. (Tr. 417) Ellis said she could sit or stand for only 15-20 minutes, could only walk one block and then suffered chest pain and leg pain, and could lift about 10 pounds. (Tr. 412-13) She testified that she could not lie down or she suffered chest pains and was unable to get up. (Tr. 413-14) Ellis also said she could stand only one out of every eight hours. (Tr. 413) She said that she slept in a recliner and spent 90 percent of each day in the recliner. (Tr. 413) She also suffered from sharp back pain that radiated all down her right leg in a stabbing pain. (Tr. 416)

In testifying about her daily activities, Ellis stated that she awakened at 5:00 A.M. to take her medications and awaken her three children. (Tr. 410-11) The children dressed themselves for school, and they also did the cooking, laundry, and cleaning. (Tr. 410, 425) Ellis' mother wrote that she helped with Ellis' cleaning and laundry. (Tr. 82) Ellis was married at the time of the hearing, but her spouse was in prison. (Tr. 425) Ellis testified that she drove about once each week, to her doctor's appointments, and that her parents took her grocery shopping. (Tr. 426)

Ellis said that she could not concentrate for more than 15 or 20 minutes before she became upset at her circumstances and

suffered anxiety and panic attacks.  (Tr. 415)  She said that she watched television and could understand what she was watching if she did not fall asleep.  (Tr. 426-27)  Ellis stated that she only socialized with family and that she did not attend movies or go out to dinner.  (Tr. 426)  She did attend  parent teacher conferences, but she could not sit long enough to watch her child's volleyball games.  (Tr. 426)  She said that she had no hobbies and did not belong to a church or to any clubs.  (Tr. 426)

Ellis stated that she had difficulty sleeping through the night and that she took Ambien which was prescribed by Dr. Yoon, a pain specialist.[9]  (Tr. 417-18)  She also was fatigued through-out the day and took five or six naps.  (Tr. 418)  Because Ellis took Lasix, she needed to use the bathroom frequently.  (Tr. 410)  She also took Xanax, which she stated resulted in headaches, dizziness, sweating, and an upset stomach.  (Tr. 418-19)  She said that she could not distinguish between an anxiety attack and possible new heart attack.  (Tr. 419-20)  Ellis stated that her blood pressure usually was about 160 to 180, but once per week it was as high as 200.  (Tr. 423)  She also said that she needed to elevate her legs to chair height.  (Tr. 410, 413)

Ellis testified about her past work experience.  (Tr. 420-422)  Her prior jobs included housekeeper at a motel, cleaner in an emergency room, and cashier-stocker-mopper at a Shell gas

---

[9] There are no medical records or notes from Dr. Yoon in the record.

station.  (Tr. 420-422)  Ellis stated that she completed her
sophomore year of high school, though she did attend school for
part of her junior year before quitting.  (Tr. 411)

ME Walter J. Miller, M.D., testified as well.  (Tr. 428-442)
The ME stated that Dr. Dave found Ellis could not function or do
anything, yet Dr. Dave categorized her as functional class 2 out
of 4 classifications on the New York Heart Association functional
scale.  This indicated that Ellis was able to ambulate and move.
(Tr. 428-29)  The ME also pointed to recent tests including an
angiogram, a stress test, and nuclear imaging, that were normal,
showing no blocked arteries, no chest pain or arrhythmia, and no
myocardial ischemia.  (Tr. 429)  Additionally, the ME found
contradictory results showing Ellis' exercise capacity was poor
during one test, yet one year later her exercise capacity had
increased to fair with no chest pain or arrhythmia.  (Tr. 429)
Ellis' blood pressure was recorded by her doctors as 120/70
during that later test, though at the height of the test it went
up to 150/78, yet her doctors described her as having severe high
blood pressure.  (Tr. 429)

The ME testified that cardiac tests dated October 18, 2007,
showed normal results such as no narrowing of the arteries and
that all muscles were normal.  However, the conclusion listed on
the test was "abnormal study."  (Tr. 430)  Dr. Dave's understand-
ing of the Questionnaire was that Ellis was unable to do any work
and would need unscheduled breaks during a work shift.  (Tr. 430)
The ME said that there were not many findings in the record to

18

support the conclusions regarding Ellis' heart difficulties, though the ME said Ellis did have an abnormal EKG with decreased straight leg raising and a balloon procedure in 2002. (Tr. 430-31) The ME stated that there were more findings to support Ellis' back pain. (Tr. 431) The ME testified that Ellis might need to elevate her legs, although possibly not on a continuous basis. (Tr. 431-32)

The ME also stated that Ellis did have some abnormal findings. (Tr. 432) Ellis had an enlarged heart (concentric hypertrophy), though frequently had normal blood pressure. (Tr. 432-33) The ME testified that it was possible to have inconsistent high and low blood pressure (Tr. 433) Ellis' attorney asked the ME if concentric hypertrophy was an indicator of high blood pressure. The ME stated that concentric hypertrophy could be due to causes other than high blood pressure, but that Ellis' cardiologist identified high blood pressure as the cause of her concentric hypertrophy. (Tr. 433)

Ellis' attorney also asked the ME whether it was possible for a patient to have angina without objective findings. (Tr. 433) The ME stated that it was not possible because angina was a very specific finding which was identified by the narrowing of coronary vessels. (Tr. 433-34) The ME pointed out that Ellis' cardiologist diagnosed angina despite normal tests. (Tr. 433-34) Dr. Dave also found that Ellis had hypertension and coronary artery disease, but the ME stated that the records showed that Ellis did not have any of those conditions. (Tr. 434) Specifi-

cally, the ME pointed to an exam on April 27, 2006, during which Ellis was examined for chest pain and shortness of breath and had normal test results leading to a conclusion of anxiety as the probable cause of those symptoms. (Tr. 435)

The ME stated that the medical record showed that Ellis did not have congestive heart failure. (Tr. 436) Dr. Miller testified that Ellis' doctor had prescribed Lasix, which was used to eliminate water, consistent with Ellis' statements that she had swelling in her legs, but that swelling in the legs could result from other causes and did not necessarily result from congestive heart failure. (Tr. 436-37)

Ellis' attorney also asked the ME about Ellis' reported ischemia. (Tr. 437-38) The ME was asked if Ellis had ischemia since she must have had ischemia when she had her heart attack in 2002. (Tr. 438) The ME stated that given Ellis' normal findings from current exams, including ones with radioactive substances, she might not have ischemia. The attorney stated that he thought if a patient had one heart attack, then that person's heart always would be compromised and that the person must have ischemia in the future. (Tr. 438) The ME stated that this was not the case in Ellis' situation as shown by her follow up studies. (Tr. 438-39) The attorney then asked whether Ellis' long term physician was in a good position to assess her condition because he had treated her regularly for three years. (Tr. 439) The ME stated that he agreed that that would be the case. He also

stated that if a patient's symptoms were not backed up by findings, then they could be the result of anxiety. (Tr. 439)

The ME agreed that Ellis appeared to have back pain and needed to be on medications to manage that pain, though he was uncertain how severe her pain was. (Tr. 440-41) He also stated that such medications may cause fatigue, drowsiness, and sleepiness. (Tr. 440-41) The ME stated that individual reactions to medications varied and that the same regimen may have different effects on an individual's wakefulness and ability to work. (Tr. 440-41) The ME also testified that he found more basis in the medical records for Ellis' back pain than for her coronary disease, although Ellis' doctor stated that her coronary disease was the cause of her disability. (Tr. 440-41) The ME agreed that the record supported finding that Ellis had received injections from Dr. Ungar-Sargon for back pain for one year and that this indicated that the doctor felt it was necessary to treat her back pain with injections. (Tr. 441-42)

VE Grace Gianforte testified last. (Tr. 442-450) The ALJ asked the VE to provide options for a hypothetical claimant of Ellis' age, education, and work experience who could do only sedentary work and could not climb ramps, ladders, ropes, or scaffolds. (Tr. 444-45) The VE also was asked to provide options for that same employee which required occasional balancing, stooping, kneeling, crouching and crawling. (Tr. 444-45) Dr. Dave had stated on the Questionnaire that Ellis never could do these last tasks. (Tr. 402) The ALJ also asked for options

21

for an employee who had to elevate her legs to stool height, which the ALJ defined as 8 inches.  (Tr. 444-45)  Dr. Dave had not answered a question on the Questionnaire regarding how high Ellis' legs must be elevated.  (Tr. 401)  Ellis herself testified that she must elevate her legs to at least chair height.  (Tr. 413-14)

Based on the limitations and abilities specified by the ALJ, the VE recommended jobs as appointment clerk and information clerk, clerical sorter, order clerk, and order taker, and credit card clerk.  (Tr. 445-46)  The ALJ asked for the list to be further limited to unskilled work, which is categorized as SVP two.  (Tr. 446)  The VE testified that this limited the list to order clerks and order takers and that there were about 12,000 such jobs available in the region.  (Tr. 446)

Ellis' attorney asked the VE several questions.  (Tr. 446-449)  He asked whether it would be consistent with competitive employment if Ellis only could be 85 percent productive.  (Tr. 446)  The VE stated that it would be critical to know whether the reduction in productivity was the result of breaks which took Ellis off task for 15 percent of the workday and which would not be consistent with competitive employment, or whether it represented an overall reduction in performance which may be consistent with employment.  (Tr. 446-47)

The VE stated that drowsiness and napping also were factors that would be adverse to employment.  (Tr. 447)  Additionally, if Ellis had to elevate her legs above 12 inches, then that would be

incompatible with desk work. (Tr. 447) Five bathroom breaks per day, if for two to three minutes each, would not be adverse to employment, she stated, but being off task for five to ten minutes at a time would be. (Tr. 447-48) Cumulatively, the VE testified if the person needed frequent breaks, her concentration was sub-par, she was off task because she was foggy and groggy due to medications, and she needed to raise her legs to chair height, that would eliminate all the potential jobs. (Tr. 448-49)

At the close of the hearing, Ellis requested that the record be held open for 30 days so she could get clarification from Dr. Dave as to how he came to his conclusions and resolve some of the inconsistencies identified by the ME. (Tr. 449) On December 20, 2007, Ellis requested that the record be held open an additional 30 days, stating that she still was waiting for additional evidence from Dr. Dave.[10] (Tr. 37) Ellis never submitted additional evidence. (Tr. 22)

The ALJ found that Ellis suffered from the following severe physical impairments: degenerative disc disease of the lumbar spine, history of coronary artery disease, hypertension, and obesity. (Tr. 24) The ALJ also found that Ellis' medically determinable mental impairment, anxiety disorder, did not cause more than minimal limitation in her ability to perform basic work

---

[10] Ellis was given 60 days after she was informed of the ALJ's unfavorable decision on October 30, 2008, to file an appeal and submit additional evidence. (Tr. 19) She did not submit additional evidence.

activities and was non-severe. (Tr. 28) Additionally, Ellis had not alleged limitation due to mental impairment, did not testify to such, and had not been treated for any mental impairment beyond having been prescribed Xanax by her treating physicians. (Tr. 28)

The ALJ further found that because the impairments from which Ellis did suffer caused only mild limitation in basic work activities, Ellis did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (Tr. 28-29) The ALJ also determined that Ellis' obesity did not cause additional impact on her condition such that she could not perform sedentary work. (Tr. 28-30)

The ALJ observed that Ellis never received treatment for fatigue despite alleging debilitating fatigue. (Tr. 31) Rather, Ellis testified that she had difficulty sleeping and was taking Ambien. (Tr. 31, 417-18) Ellis speculated during the hearing that her medications might be responsible for her fatigue. (Tr. 440) Dr. Dave listed drowsiness and fatigue as side effects of Ellis' medications, but when asked, did not list any implications of these side effects for her working. (Tr. 400) The ALJ noted that inconsistencies between the record and Ellis' testimony, or between Ellis' testimony during the hearing and her statements at other times, tended to diminish her credibility. (Tr. 31) The ALJ also found that she could not credit Ellis' need for frequent bathroom breaks as a side effect of one of her medications, Lasix, because Dr. Dave's notes made no mention of Ellis taking

Lasix.  (Tr. 31)  However, Dr. Dave did inform Dr. Chube that he
had started Ellis on Lasix in 2005.  (Tr. 340)

Thus, the ALJ found that Ellis could perform sedentary work
with some limitations and that given Ellis' age, education, work
experience, and residual functional capacity, there were jobs in
significant numbers in the national economy that she could
perform.  (Tr. 29-34)  The ALJ then determined that Ellis had not
been under a disability as defined in the Social Security Act
from April 1, 2004 through the date of the hearing.  (Tr. 33-34)

The ALJ stated that she considered whether the intensity,
persistence, and limiting effects attributed to impairment were
substantiated by objective medical evidence.  (Tr. 30)  Deciding
that they were not, the ALJ made a determination regarding the
credibility of the testimony and evidence regarding the effects
of Ellis' impairment on her ability to work, based on the record.
(Tr. 30)  The ALJ stated that she was mindful that Dr. Dave was a
specialist and the treating physician, but that she could not
give great weight to his opinion or Ellis' testimony because the
medical record showed normal test results and only supported
findings of minimal limitations.[11]  (Tr. 32)  The ALJ stated that
some of the contributing factors, obesity since 2000 and a 2002
heart attack, did not prevent Ellis from working through April
2004.  (Tr. 30-32)  The ALJ stated that she did consider the

---

[11]  "While I am mindful that Dr. Dave is a specialist and a treating physi-
cian, I cannot give his opinion as to the claimant's cardiac residual func-
tional capacity significant weight."  (Tr. 32)

aggravating effects of Ellis' combined impairments. (Tr. 30-32)
The ALJ added that she gave greater weight to the opinion of the
ME because he provided detailed explanations for his testimony.
(Tr. 32)

Ellis raises three issues in her request for reversal of the
ALJ's decision: whether the ALJ committed legal error by reject-
ing the opinion of Ellis' treating physician without assessing
that opinion according to the regulations, whether the ALJ
committed legal error by making an RFC without considering all of
the evidence, and whether the ALJ's credibility determination was
legally sufficient.

## Discussion

The standard for judicial review of an ALJ's finding that a
claimant is not disabled within the meaning of the Social Secu-
rity Act is limited to a determination of whether those findings
are supported by substantial evidence. 42 U.S.C. §405(g) ("The
findings of the Commissioner of Social Security, as to any fact,
if supported by substantial evidence, shall be conclusive.");
Schmidt v. Barnhart, 395 F.3d 737, 744 (7th Cir. 2005); Lopez ex
rel Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003). Sub-
stantial evidence has been defined as "such relevant evidence as
a reasonable mind might accept to support such a conclusion."
Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28
L.Ed.2d 852 (1972)(quoting Consolidated Edison Co. v. NLRB, 305
U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). See
also Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003)(quoting

Johansen v. Barnhardt, 314 F.3d 283, 287 (7th Cir. 2002))(citing Sims v. Barnhardt, 309 F.3d 424, 428 (7th Cir. 2002)) ("Evidence is 'substantial' if it is sufficient for a reasonable person to accept as adequate to support the decision.").  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law.  Rice v. Barnhart, 384 F.3d 363, 368-369 (7th Cir. 2004); Scott v. Barn-hart, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues."  Lopez, 336 F.3d at 539.

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.  The claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A).  The Social Security regulations enumerate the five-step sequential evalua-tion to be followed when determining whether a claimant has met the burden of establishing disability.  20 C.F.R. §404.1520, §416.920.  The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity."  20 C.F.R. §404.1520(b), §416.920(b).  If she is, the claimant is not disabled and the evaluation process is over; if she is not,

the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. §404.1520(c), §416.920(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. §401, pt. 404, subpt. P, app. 1. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of her past work. If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled. 20 C.F.R. §404.1520(e), §416.920(e). However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy. 42 U.S.C. §423(d)(2); 20 C.F.R. §404.1520(f), §416.920(f).

Ellis presents three challenges to the ALJ's denial of disability. First, Ellis argues that the ALJ did not give adequate weight to the opinion of Dr. Dave at steps two and three of the ALJ's analysis. Ellis asserts that the ALJ discounted Dr. Dave's opinion without considering all five factors as required

in 20 C.F.R. §414.1527(d), that the ALJ gave greater weight to the testimony of the ME than to Dr. Dave's opinion without explaining why the ME's opinion was more persuasive than Dr. Dave's, and that the ALJ's discussion of the inconsistencies in Dr. Dave's reports contained an independent medical finding by the ALJ and failed to consider that the aggregate effects of all of Ellis' conditions may result in more severe impairment than any of her conditions would create singly.

A treating source's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. §404.1527(d)(2). See also SSR 96-2p (explaining same); Schmidt v. Astrue, 496 F.3d 833, 842 (7th Cir. 2007) (same); Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003) (same). Inconsistencies in a treating physician's opinion, whether conflicting internally or with other substantial evidence in the record, may justify denying the opinion controlling weight if the ALJ gives a good reason for doing so. 20 C.F.R. §404.1527(c)(2); Schaaf v. Astrue, 602 F.3d 869, 875 (7th Cir. 2010). See, e.g., Schmidt, 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for re-editing or

rejecting evidence of disability."); Latkowski v. Barnhart, 93
Fed. Appx. 963, 969 (7th Cir. 2004)(same).

Ellis alleges that the ALJ rejected Dr. Dave's reports that
she was severely limited by her symptoms without giving consider-
ation to Dr. Dave's role as Ellis' treating physician, his
opportunity to examine her, and his cardiac specialization.
Ellis also alleges that the ALJ failed to explain why she as-
signed greater weight to the testimony of the ME, who never had
examined Ellis. In fact, the ALJ explicitly considered these
factors, stating, "While I am mindful that Dr. Dave is a special-
ist and a treating physician, I cannot give his opinion as to the
claimant's cardiac residual functional capacity significant
weight." The ALJ then detailed the reasons she discounted Dr.
Dave's opinion and gave greater weight to the ME's testimony.
The ALJ cited the ME's findings that objective medical evidence
did not support Dr. Dave's assessment of the severity of Ellis'
symptoms and that Dr. Dave's treatment notes and opinions con-
tained internal inconsistencies. The ALJ compared Dr. Dave's
reports unfavorably to the ME's "cogent and well reasoned"
opinion, which she found more consistent with the record as a
whole and supported by substantial objective medical evidence.
The ALJ found that Ellis had severe impairments, including
conditions listed by Dr. Dave on his report and also by the ME,
but she also found that the opinion of the ME regarding the
persistence and limitations of the symptoms associated with the
impairments was more consistent with the record.

Ellis also argues that the ALJ concluded on her own that Dr. Dave's classification of Ellis' cardiac condition as functional class II on the New York Heart Association scale was inconsistent with his report of her severe physical limitations and that this conclusion constituted an independent medical finding by the ALJ. In fact, the ME found Dr. Dave's report inconsistent with his classification of Ellis and the medical evidence. The ALJ adopted the ME's opinion, which she found well-reasoned and supported by substantial evidence, over Dr. Dave's report, which was not. See Schmidt, 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for re-editing or rejecting evidence of disability."). As in Schmidt, the ALJ was confronted with an opinion from a treating physician that was not supported by evidence in the medical record, was inconsistent with his patient notes, was contradicted by another source, and was not supported by new medical evidence or other explanation to justify such extreme limitations. The ALJ here articulated her concerns regarding Dr. Dave's opinions and explained why she found the ME's assessment more compelling. Like the Schmidt court, this court also finds that in such circumstances, an ALJ's decision not to accord controlling weight to the treating physician's opinion was reasonable.

Further, Ellis contends that the ALJ found Dr. Dave's assessment that Ellis had severe limitations inconsistent with his functional classification of her cardiac condition because the ALJ failed to understand that Dr. Dave considered the aggregate effect of all of Ellis' conditions on her ability to work in his assessment but only evaluated her cardiac condition in determining her functional class. As noted above, the ME identified the inconsistencies in Dr. Dave's reports and the ALJ found the ME's opinion persuasive. The ME came to his conclusions only after reviewing the entire record and observing the hearing, which included testimony and evidence regarding the aggravating effects of Ellis' obesity and her degenerative disc disease. The ALJ also found that Ellis' obesity and degenerative disc disease were severe impairments and explicitly considered the aggravating effects of her impairments on her condition. The ALJ articulated her reasons for rejecting Dr. Dave's report in favor of the ME's opinion, citing substantial medical and nonmedical evidence from the record, and so did not err.

Ellis' second issue on appeal is that the ALJ committed legal error in completing the RFC without considering all of the evidence regarding Ellis' impairments, including Ellis' need to elevate her legs, her limited ability to sit for periods of time, and the effect of her obesity on her ability to work. SSR 96-8p explains how an ALJ should assess a claimant's RFC at steps four and five of the sequential evaluation. In a section entitled, "Narrative Discussion Requirements," SSR 96-8p specifically

spells out what is needed in the ALJ's RFC analysis.  This
section of the ruling provides:

> The RFC assessment must include a narrative
> discussion describing how the evidence sup-
> ports each conclusion, citing specific medi-
> cal facts (e.g., laboratory findings) and
> nonmedical evidence (e.g., daily activities,
> observations). In assessing RFC, the adjudi-
> cator must discuss the individual's ability
> to perform sustained work activities in an
> ordinary work setting on a regular and con-
> tinuing basis (i.e., 8 hours a day, for 5
> days a week, or an equivalent work schedule),
> and describe the maximum amount of each work-
> related activity the individual can perform
> based on the evidence available in the case
> record. The adjudicator must also explain how
> any material inconsistencies or ambiguities
> in the evidence in the case record were con-
> sidered and resolved. (footnote omitted)

SSR 96-8p

Thus, as explained in this section of the ruling, there is a

difference between what the ALJ must contemplate and what she

must articulate in her decision.  "The ALJ is not required to

address every piece of evidence or testimony presented, but he

must provide a 'logical bridge' between the evidence and his

conclusions."  Getch v. Astrue, 539 F.3d 473, 480 (7th Cir. 2008)

(quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)).

Ellis asserts that the ALJ did not have a sufficient basis

to find that she needed to elevate her legs only as high as stool

height, which the ALJ defined as eight inches high, rather than

to a height of more than 12 inches, which is incompatible with

work.  Ellis is correct.  "The adjudicator must also explain how

any material inconsistencies or ambiguities in the evidence in

the case record were considered and resolved." SSR 96-8p. "An
ALJ's decision cannot stand if it lacks evidentiary support or an
adequate discussion of the issues." Lopez, 336 F.3d at 539. As
in Lopez, the claimant's allegation partially was supported by
the medical evidence. The ALJ ignored part of the allegation
without providing reasons for her decision that were supported by
the medical evidence and sufficiently specific to have made clear
to the claimant and subsequent reviewers the reasons for her
findings. Both the ME's testimony and Dr. Dave's report agreed
that Ellis needed to elevate her legs with prolonged sitting.[12]
Neither Dr. Dave nor the ME offered an opinion regarding the
height to which Ellis would need to elevate her legs.[13] The ALJ
did not query any medical expert for clarification about the
degree of accommodation which Ellis required and so did not have
sufficient evidence to resolve this ambiguity. The distinction
between a need to elevate only to 8 inches rather than 12 inches
was critical given the VE's subsequent opinion.

---

[12] In the government's response brief, the Commissioner correctly asserts that
none of Ellis' doctors' notes directed her to elevate her legs at all.
However, at the time of the hearing, both Dr. Dave and the ME agreed that
Ellis' back condition was such that she did need to elevate her legs when she
sat for prolonged periods of time.

13 On the Cardiac Residual Functional Capacity Questionnaire, Dr. Dave
specifically was asked to give an opinion as to how high and for how long
Ellis would need to elevate her legs. (Tr. 401) He declined to answer either
question. The ME was not asked to offer an opinion about how high Ellis might
need to elevate her legs. He did testify that he was uncertain that Ellis
would need to elevate her legs continuously. Ellis stated she needed to
elevate her legs to recliner height, which her attorney estimated to be waist
high. As discussed below, Ellis' testimony was not credible.

The VE's testimony, which was undisputed, showed that the distinction could be dispositive. The VE testified that a need to elevate one's legs more than 12 inches would be incompatible with the postural requirements of desk work, but a need to elevate one's legs eight inches would not be adverse to competitive employment. Since the ME and Dr. Dave were consistent in their opinions that Ellis needed to elevate her legs, and since the record was ambiguous as to whether Ellis required that accommodation to a degree that would render her disabled as defined under the Social Security Act, the ALJ was responsible for ensuring that the record was developed sufficiently on that point before she completed the assessment.[14] An ALJ "will try to obtain additional evidence" when "the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled." 20 C.F.R. §404.1527(c)(3). See Barnett v. Barnhart, 381 F.3d 664, 669 (7th Cir. 2004)("An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable."). See also Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004)("An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled.").

---

14 The ALJ left the record open for 30 days after the October 2007 hearing, at Ellis' request, so that Ellis could submit additional medical evidence from Dr. Dave. On December 20, 2007, Ellis requested an additional 30 days as she still was waiting for the information from Dr. Dave. Ellis was given 60 days to submit new evidence after she received notice of the ALJ's unfavorable decision in October 2008. No additional information was submitted.

The evidence here was sufficient to determine that Ellis did need to elevate her legs with prolonged sitting, and the ALJ found that Ellis was restricted in this way. (Tr. 29) Unlike Skarbek, where the ALJ's finding adverse to the claimant was supported by x-rays and a treating physician's progress notes, the evidence here was not sufficient for the ALJ to determine whether Ellis needed to elevate her legs more or less than 12 inches high.[15] The ALJ could not build an accurate and logical bridge from the evidence, that Ellis needed to elevate her legs, to her conclusion, that Ellis need only elevate to a height of 8 inches. For these reasons, the finding by the ALJ that Ellis needed to elevate her legs at her workstation was correct, but the ALJ's finding that Ellis needed to elevate her legs only to a height of 8 inches was not supported by the record.

Ellis also argues that the ALJ's RFC failed to consider the implications of Ellis' limited ability to sit. The ALJ must describe how evidence supports her conclusions and explain how any material inconsistencies or ambiguities were resolved. SSR 96-8p. In her discussion of Ellis' ability to sit, the ALJ noted that there were several conflicting pieces of evidence. (Tr. 30-32) Although Ellis stated that she could sit for only 15-20 minutes at a time before her back pain became such that she had

_____

15 Both the ME and Dr. Dave agreed that Ellis did need to elevate her legs, and neither offered an opinion about how high she should elevate her legs. The ALJ did not ask the ME or Dr. Dave for clarification. The only participant who suggested that Ellis might need to elevate her legs to the height of an 8 inch stool was the ALJ. There is no support for this suggestion in the record.

to get up, Ellis' treating physician reported that she could sit
for up to 30 minutes.  The ME reviewed the entire record, lis-
tened to Ellis' testimony at the hearing, and determined that
Ellis' back pain limited her to sedentary work at which she could
elevate her legs.  The ALJ found the opinion of the ME more per-
suasive and adopted his recommendation.

The ALJ detailed her reasons for finding Ellis' testimony
regarding the severity of her symptoms not entirely credible and
explained why she discounted the testimony.  The ALJ also ex-
plained why she accorded greater weight to the ME's opinion of
Ellis' limitation and its affect on her ability to engage in
sedentary work than to Dr. Dave's report or Ellis' self-reported
limitations.  In her decision, the ALJ cited medical facts such
as the relatively normal results of Ellis' recent cardiac and
exercise capacity test and the internal inconsistencies in Dr.
Dave's notes that the ME found important, as well as nonmedical
evidence such as her determination that Ellis' testimony was not
entirely credible.  Additionally, the VE testified that if Ellis
needed to get up for several two to three minute breaks per day,
that would not be adverse to competitive employment.  An ALJ's
discussion of the relative persuasiveness of medical expert
opinions, supported by other evidence from the record, consti-
tutes sufficient articulation of her reasons for a decision to
assign greater weight to one medical expert's opinions than
another's.  Schmidt, 496 F.3d at 843.  As in Schmidt, the ALJ

here cited specific reasons why she adopted the ME's opinion and discounted Dr. Dave's.

Ellis also contends that the RFC was flawed by the ALJ's failure to consider the effects of Ellis' obesity on her condition. If a claimant is obese, the ALJ must consider the "incremental effect" of obesity on the claimant's limitations. Gentle v. Barnhart, 430 F.3d 865, 868 (7th Cir. 2005). Even if a claimant does not contend that obesity is one of her impairments, SSR 02-1p requires an ALJ to consider the effects of obesity on the claimant's other conditions. However, failure to consider these effects explicitly can be "harmless error." Prochaska v. Barnhart, 454 F.3d 731, 736 (7th Cir. 2006). Because the ALJ in Prochaska "sufficiently analyzed" the claimant's obesity (by implicitly considering the issue, in part by relying on medical documents that noted the claimant's height and weight), and because the claimant did not specify how obesity specifically impaired her work ability, the Seventh Circuit found that any error on the ALJ's part in explicitly considering the claimant's obesity was harmless. Prochaska, 454 F.3d at 737. See Skarbek, 390 F.3d at 504 (finding that the ALJ's adoption of limitations suggested by doctors who were aware of claimant's obesity, plus claimant's failure in specifying how weight impaired the ability to work, was harmless error).

The ALJ did consider and address the effects of Ellis' obesity on her medical condition and her ability to work. In finding three, the ALJ found that Ellis was obese and that Ellis'

obesity was a severe impairment that compromised her ability to perform basic work activities. In finding four, the ALJ explicitly stated that she had evaluated the effect of Ellis' obesity on her condition and determined that Ellis did not have an impairment or combination of impairments that met or equaled an impairment listed in the regulations. Further, the ALJ gave great weight to the opinion of the ME who reviewed Ellis' medical records, including reports of her obesity and its aggravating effects, and stated that there was substantial support in the record for Ellis' back pain and the aggravating effects of her obesity on her condition. The ALJ also adopted the limitation suggested by the ME, who was aware of Ellis' back pain and the aggravating effects of her obesity, that Ellis be restricted to sedentary work at which she could elevate her legs. Like the ALJ in Prochaska, the ALJ here sufficiently analyzed the issue by implicitly considering it when adopting the ME's opinion which took into account Ellis' obesity and the effect it may have on her other conditions. Additionally, the ALJ explicitly addressed Ellis' obesity and its effect on her condition in the RFC. Therefore, the ALJ did not fail to consider the effects of Ellis' obesity.

Finally, Ellis contests the ALJ's finding that her testimony was not entirely credible. This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. Schmidt, 496 F.3d at 843. See also Prochaska, 454 F.3d at 738 ("Only if the trier of fact grounds

his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles her opinion to great deference. Allord v. Barnhart, 455 F.3d 818, 821 (7th Cir. 2006); Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. Steele v. Barnhart, 290 F.3d 936, 942 (7th Cir. 2002). Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." Clifford, 227 F.3d at 872.

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §404.1529(a). See also Arnold v. Barnhart, 473 F.3d 816, 823 (7th Cir. 2007)("[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); Scheck v. Barnhart, 357 F.3d 697, 703 (7th Cir. 2004)(declining to overturn an ALJ's credibility determination regarding a claimant because the ALJ was clearly aware of the factors to be considered in evaluating a claimant's credibility and followed them in her decision making,

so her credibility determination was entitled to special defer-
ence).  If the claimant's impairments reasonably could produce
the symptoms of which the claimant is complaining, the ALJ must
evaluate the intensity and persistence of the claimant's symptoms
through consideration of the claimant's "medical history, the
medical signs and laboratory findings, and statements from [the
claimant, the claimant's] treating or examining physician or
psychologist, or other persons about how [the claimant's] symp-
toms affect [the claimant]."  20 C.F.R. §404.1529(c).  See also
Schmidt v. Barnhart, 395 F.3d at 746-47 ("These regulations and
cases, taken together, require an ALJ to articulate specific
reasons for discounting a claimant's testimony as being less than
credible, and preclude an ALJ from merely ignoring the testimony
or relying solely on a conflict between the objective medical
evidence and the claimant's testimony as a basis for a negative
credibility finding.").

Although a claimant's complaints of pain cannot be totally
unsupported by the medical evidence, the ALJ may not make a
credibility determination "solely on the basis of objective
medical evidence."  SSR 96-7p, at *1.  See also Indoranto v.
Barnhart, 374 F.3d 470, 474 (7th Cir. 2004); Carradine v. Barn-
hart, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling,
the fact that its source is purely psychological does not disen-
title the applicant to benefits.").  Rather, if the

> [c]laimant indicates that pain is a signifi-
> cant factor of his or her alleged inability
> to work, the ALJ must obtain detailed de-

scriptions of the claimant's daily activities
by directing specific inquiries about the
pain and its effects to the claimant.  She
must investigate all avenues presented that
relate to pain, including claimant's prior
work record, information and observations by
treating physicians, examining physicians,
and third parties.  Factors that must be
considered include the nature and intensity
of the claimant's pain, precipitation and
aggravating factors, dosage and effectiveness
of any pain medications, other treatment for
relief of pain, functional restrictions, and
the claimant's daily activities.  (internal
citations omitted)

Luna v. Shalala, 22 F.3d 687, 691 (7th Cir.
1994)

See also Zurawski v. Halter, 245 F.3d 881, 887-88 (7th Cir. 2001)

(quoting Luna, 22 F.3d at 691).

In addition, when the ALJ discounts the claimant's descrip-

tion of pain because it is inconsistent with the objective

medical evidence, she must make more than "a single, conclusory

statement . . . .  The determination or decision must contain

specific reasons for the finding on credibility, supported by the

evidence in the case record, and must be sufficiently specific to

make clear to the individual and to any subsequent reviewers the

weight the adjudicator gave to the individual's statements and

the reasons for that weight."  SSR 96-7p, at *2; Zurawski, 245

F.3d at 887.  See also Diaz v. Chater, 55 F.3d 300, 307-08 (7th

Cir. 1995) (finding that the ALJ must articulate, at some minimum

level, his analysis of the evidence).  She must "build an accu-

rate and logical bridge from the evidence to her conclusion."

Zurawski, 245 F.3d at 887 (quoting Clifford, 227 F.3d at 872).

When the evidence conflicts regarding the extent of the claim-
ant's limitations, the ALJ may not simply rely on a physician's
statement that a claimant may return to work without examining
the evidence the ALJ is rejecting.  See Zurawski, 245 F.3d at 888
(quoting Bauzo v. Bowen, 803 F.2d 917, 923 (7th Cir. 1986))
("Both the evidence favoring the claimant as well as the evidence
favoring the claim's rejection must be examined, since review of
the substantiality of evidence takes into account whatever in the
record fairly detracts from its weight.") (emphasis in original).

    In support of her claim, Ellis asserts that the ALJ did not
fully credit her testimony regarding her limited ability to sit
for periods of time in determining that Ellis was capable of some
sedentary work and that the ALJ placed too great an emphasis on
the medical record and testimony of the ME and VE.  When evidence
conflicts regarding the extent of the claimant's limitations, the
ALJ must examine the evidence favoring and detracting from the
claim.  Zurawski, 245 F.3d at 888.  The ALJ may not make a
credibility determination based on the medical record alone, but
a claimant's complaints cannot be totally unsupported by medical
evidence.  SSR 96-7p, at *1.  Discrepancies between objective
evidence and self-reports may suggest symptom exaggeration.
Sienkiewicz v. Barnhart, 409 F.3d 798, 804 (7th Cir. 2005).  The
court in Sienkiewicz noted that the claimant's complaints of
extreme pain were inconsistent with the findings of the many
doctors who examined her and found that this inconsistancy
supported the ALJ's conclusion that Sienkiewicz had only minimal

or moderate limitations rather than the severe limitations she claimed. Id.

Here, there was conflicting evidence on the issue of Ellis' limited ability to sit. Ellis testified that she could sit for only 15-20 minutes at a time before needing to get up and could not sit long enough to watch her daughter's volleyball games. Dr. Dave, however, reported that Ellis could sit for up to 30 minutes at a time. The ME testified, based on his review of the entire medical record and his observations at the hearing, that Ellis' limitations restricted her to sedentary work at which she could elevate her legs. Additionally, the VE was asked to consider the effect Ellis' need to get up for frequent breaks would have on her ability to work, and the VE testified that several two-three minute breaks each day would not be adverse to competitive employment.

The ALJ articulated her specific reasons for giving greater weight to the opinions of the ME and the VE, which she found well-reasoned and well supported, than she gave to Dr. Dave's opinion, which both the ALJ and the ME noted was contradicted by Dr. Dave's own treatment notes. The ALJ also specified that she did not find Ellis' testimony credible because Ellis gave conflicting reports regarding her activities and symptoms.[16]   It was

---

16 Ellis claims her medications caused disabling fatigue which required her to take regular naps.  However, Ellis never was treated for this symptom. Further, Ellis reported that she stopped smoking after her heart attack in 2002, but she also reported that she was smoking a pack of cigarettes per day in September 2005 and October 2005.  Additionally, Ellis reported a disability onset date of April 2004, and she had not reported earned income since 2004. According to Dr. Ungar-Sargon's treatment notes, however, Ellis reported that

reasonable for the ALJ to find the opinion of the ME more persuasive than that of Dr. Dave and to discount Ellis' testimony, which conflicted with parts of both opinions and the record.

Ellis also asserts that the ALJ failed to consider the aggravating effects of Ellis' obesity on her symptoms. Ellis correctly states that an ALJ must consider the effects of a claimant's obesity on the claimant's other conditions. SSR 02-1p. The ALJ considered the aggregate effects of all of Ellis' impairments, including obesity, on her ability to work. The ALJ specifically addressed the incremental effects of Ellis' obesity on her other conditions in making two determinations. The ALJ considered Ellis' obesity in determining that Ellis did not have a combination of impairments equal to one of the listed impairments, and the ALJ also determined that Ellis' obesity did not cause additional impact on Ellis' condition such that Ellis could not perform sedentary work. In both determinations, the ALJ explicitly evaluated Ellis' obesity and its incremental effects.

Ellis also contends that the ALJ erroneously disregarded her testimony of debilitating fatigue. An ALJ may disregard a claimant's assertions if she validly finds them not credible. Schmidt, 496 F.3d at 843-44. A claimant's statements may be

---

in January 2005 she had returned to work and slipped and fell on the ice. In September, October, and November 2005, Ellis reported being employed as a desk clerk at the Pioneer Motel. In her brief, Ellis appears to misunderstand the ALJ's discussion of Ellis' reported employment as an evaluation of Ellis' ability to work during that time based on reports that she was employed during that time. Rather, the ALJ stated that this discrepancy was a factor in her evaluation of Ellis' credibility and of the weight to give to her testimony.

found less than credible if "the level or frequency of treatment is inconsistent with the level of complaints." SSR 96-7p.  The ALJ observed that Ellis never received treatment for fatigue.  Rather, Ellis testified that she had difficulty sleeping and was taking Ambien.  Ellis speculated that her medications might be responsible for her fatigue.  The ME testified that the medications Ellis took might cause drowsiness and fatigue.  The ME stated that individual reactions to medications varied and that the same regimen might have different effects and in varying degrees on different individuals' wakefulness and ability to work.  Dr. Dave listed drowsiness and fatigue as side effects of Ellis' medications but, when asked, did not list any implications of these side effects for her working.  It was reasonable for the ALJ to discount Ellis' testimony given the discrepancies between her self-reported debilitating fatigue and the conflicting documentation in the record.

Lastly, Ellis contends that the ALJ erred in rejecting her testimony regarding her need for frequent bathroom breaks in the determination of her RFC.  Ellis argues that this error requires reconsideration of the ALJ's credibility determination.  The ALJ stated that she did not credit Ellis' need for frequent bathroom breaks as a side effect of one of her medications, Lasix, because Dr. Dave's notes made no mention of Ellis taking Lasix.  However, Dr. Dave informed Dr. Chube that he had started Ellis' on Lasix in 2005.  Additionally, the record showed that Ellis had been prescribed Lasix in 2005 and 2006, and the ME testified during

the hearing that Ellis was prescribed Lasix to eliminate water or edema.  The ALJ's statement was erroneous.  The ALJ, however, made this error in her determination of Ellis' Residual Functional Capacity, not as a factor in her determination of Ellis' credibility.  Since the issue of whether Ellis had been prescribed Lasix was not part of the credibility determination, the ALJ would not have reached a different credibility determination, even with accurate information on that point, so this mistake was harmless error.[17]  Keys v. Barnhardt, 347 F.3d 990, 994-95 (7th Cir. 2003)(applying the doctrine of harmless error to judicial review of administrative decisions and declining to remand because the factual determinations would still compel denial of benefits).  See also Skarbek, 390 F.3d at 504 (declining to remand for explicit consideration of an issue because reconsideration of that issue would not affect the outcome of the case).  Similarly, the ALJ's credibility determination regarding Ellis' testimony would not have changed with knowledge of Ellis' Lasix prescription.

---

[17] In making her determination of Ellis' RFC, the ALJ indirectly considered Ellis' prescription for Lasix and her need for frequent bathroom breaks through the opinions of the ME and VE.  When an ALJ adopts limitations suggested by the specialists and reviewing doctors who were aware of the claimant's condition, the ALJ has factored that condition indirectly into her decision as part of the doctors' opinions.  Skarbek, 390 F.3d at 504.  The ME testified that Ellis was taking Lasix at the time of the hearing.  The VE was asked what affect Ellis' need for frequent bathroom breaks would have on employment, and the VE stated that several two-three minute breaks per day would not be adverse to competitive employment.  Both opinions were accepted and given great weight, by the ALJ.

The ALJ made her credibility determination by reviewing all of the available evidence regarding Ellis' symptoms, pain, treatment, aggravating factors, and limitations. The court will reverse an ALJ's credibility determination only if it is "patently wrong" and unreasonable or not supported by the record. The ALJ discussed the weight that she gave to evidence and the relative merit she assigned to conflicting opinions, reports, and testimony, provided specific reasons why she found Ellis not entirely credible, and adequately articulated how her analysis resulted in her conclusions.

————————————————

For the foregoing reasons both the ALJ's decision to give greater weight to the testimony of the state's medical experts and less weight to the opinion of Dr. Dave, and the ALJ's determination regarding Ellis' credibility are AFFIRMED. However, the ALJ's finding that Ellis need only elevate her legs to a stool height of eight inches and the ALJ's determination that there are jobs available in the national economy in significant numbers that Ellis is capable of performing, given the leg elevation finding, is REVERSED and REMANDED.

ENTERED this 20th day of September, 2010


s/ ANDREW P. RODOVICH
United States Magistrate Judge